Robert CONVERSE, Jeanne Phillips and Borg Enterprises, Inc., d/b/a Capitol Fur Company, Individually, and on behalf of all others similarly situated, Plaintiffs,

v.

AMERITECH CORPORATION and Michigan Bell Telephone Company, Defendants.

No. 5:95–CV–141.

United States District Court, W.D. Michigan, Southern Division.

Sept. 16, 1997.

**534**

Kevin T. McGraw, Foster, Swift, Collins & Smith, P.C., Lansing, MI, Robert E. Reeves, Reeves & Graddy, Lexington, KY, for Plaintiffs.

Phyllis Golden Morey, Ameritech, Detroit, MI, Peter H. Ellsworth, Dickinson, Wright, Moon, Van Dusen, et al., Lansing, MI, Louis F. Bonacorsi, Bryan Cave, L.L.P., St. Louis, MO, Richard C. Godfrey, Gabriela I. Monahan, Jeffrey S. Powell, Kirkland & Ellis, Chicago, IL, for Defendants.

## OPINION

BENJAMIN F. GIBSON, Senior Judge.

This action stems from defendants' initiation, marketing, and sale of inside wire maintenance services, known as Line–Backer and Line–Backer Plus. Plaintiffs move for class certification, to compel discovery or strike defendants' response to their motion for class certification, and to file a supplemental exhibit. For the following reasons, plaintiffs' motion for class certification is denied, their motion to compel or strike is granted in part and denied in part, and their motion to file a supplemental exhibit is denied.

### I.

Inside wire maintenance service ("IWMS") involves the maintenance and repair of the wiring which connects the telephone wire and jacks in a home or simple business office to the outside telephone network. Before 1987, IWMS was provided to all Michigan Bell customers as part of their basic telephone service package and included within a single monthly charge. In January of 1986, the Federal Communications Commission ("FCC") ordered the detariffing of all inside wire services. On November 17, 1986, pursuant to the FCC order, Michigan Bell filed an application for authority to complete the detariffing of its IWMS plans known as Line–Backer and Line–Backer Plus ("Line–Backer"), which became effective on January 1, 1987. Accordingly, after January 1, 1987, IWMS plans became an optional service.

Line–Backer was originally promoted through newspaper advertisements and information contained in customer bills. A detachable authorization card was included in each mailing. If customers wanted to order Line–Backer, they had to sign and return the authorization card. Customers who failed to return the card were not enrolled in Line–Backer nor were they charged for the service.

After the initial promotion, Michigan Bell used a variety of methods to inform customers of the service and to accept purchases of Line–Backer. From approximately 1987 through 1994, newsletters inserted in monthly customer bills contained articles informing customers about Line–Backer. The articles included a telephone number for customers to call to gain additional information about Line–Backer. Other types of billing inserts were also used to promote Line–Backer or inform customers of rate increases. In addition, direct mail letters were sent to customers which described Line–Backer. Some of these direct mailings included an authorization card for customers to return if they wanted to order Line–Backer. On occasion, Michigan Bell used a combination of direct mail promotions followed by telemarketing solicitations. From approximately 1987 to 1991, telephone solicitations were initiated by customer service representatives in Michigan Bell's Direct Marketing Center or by independent contractors. Since 1987, Michigan Bell service technicians have also promoted Line–Backer when they visited customer premises to make repair calls. The service technicians would describe the service and provide a telephone number which customers could call for additional information.

The primary way in which Michigan Bell marketed, and customers purchased, Line–Backer was through telephone conversations between customers and service representatives at Michigan Bell's Customer Care Centers. Most of the conversations occurred when customers called to connect telephone service or change their existing service. The service representatives were responsible for responding to inquiries and providing information about Line–Backer. Information provided by service representatives was not scripted, but varied depending on the service representative and the particular customer's questions and concerns.

Plaintiffs allege that the manner in which Line–Backer was offered to existing and potential customers and the way in which price increases were carried out violate the Sherman Act, 15 U.S.C. § 2, and the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.* Under Michigan law, plaintiffs also allege money had and received and that the contracts entered into for Line–Backer are void or voidable.

## II.

First, the Court will address plaintiffs' emergency motion to compel discovery and/or strike defendants' briefs in opposition to plaintiffs' motion for class certification. Plaintiffs explain that in interrogatories they submitted to defendants on October 9, 1995, they requested information about the marketing of Line–Backer. Specifically at issue are interrogatories 19, 20, and 26, which request information about Line–Baker as follows: interrogatory 19 requests the names and job title of every employee of Ameritech and Michigan Bell who are involved or otherwise responsible for decisions concerning Line–Backer; interrogatory 20 requests the names and job titles of employees of Ameritech and Michigan Bell involved in or responsible for decisions concerning the content of documents and other materials containing information about Line–Backer and the content of notifications concerning the optional nature of Line–Backer; and interrogatory 26 asks defendants to identify each effort made by or on behalf of Ameritech and Michigan Bell to market or otherwise notify new customers of the optional nature of Line–Backer.

Defendants responded to plaintiffs' interrogatories on November 13, 1995, but refused to answer interrogatories 19, 20, and 26, arguing that such information is outside the scope of discovery on class certification. Plaintiffs filed a motion to compel, and a hearing on the issue occurred on July 26, 1996. At the hearing, Magistrate Judge Brenneman ordered Ameritech to answer interrogatories 19, 20, and 26, but denied the motion as to Michigan Bell.

██ Plaintiffs now object to affidavits submitted by defendants in opposition to plaintiffs' motion for class certification. Plaintiffs assert that the affidavits are made by employees whose names defendants successfully argued plaintiffs were not entitled to know. The Court has reviewed the affidavits in question and finds it unnecessary to order further discovery. Instead, the Court will consider whether each affidavit is appropriate and will strike the affidavit of any person whose name was requested by plaintiffs but was not disclosed by defendants.

First, Edward Shultz is an employee of Ameritech Information Services, Inc. Shultz was disclosed to plaintiffs, who took his deposition. Accordingly, the Court will not strike his affidavit. Ruth Curtis is an employee of Michigan Bell; therefore, defendants were not required, under the Magistrate Judge's Order, to produce her name. However, the information contained in her affidavit clearly relates to the information sought in interrogatory 19. The Magistrate Judge found that the information requested from Michigan Bell in interrogatory 19 was outside the scope of class certification. Therefore, defendants may not use such evidence in response to plaintiffs' motion for class certification. The Court will strike Curtis's affidavit. Kevin Harvey is also an employee of Michigan Bell. The Court finds that the information contained in his affidavit does not pertain to the information sought in any of the interrogatories in question and will therefore not strike his affidavit. Richard Dale Hughes is an employee of Ameritech Consumer Direct Marketing. The information in his affidavit relates to interrogatory 26. De-

fendants contend that Ameritech Consumer Direct Marketing is not the same company as defendant Ameritech; therefore, defendants argue that plaintiffs never requested his name from his employer and defendants were not ordered to disclose his name. Plaintiffs do not contradict defendants' assertion regarding Hughes. The Court will not strike his affidavit. Sandra Smoke is an Ameritech employee. The information contained in her affidavit does not relate to any of the interrogatories in question. The Court will not strike her affidavit. Finally, plaintiffs ask the Court to strike the affidavit of Christine Hansen; however, the Court is unable to locate any such affidavit. In conclusion, the Court will strike the affidavit of Ruth Curtis; however, plaintiffs have failed to prove that the other affidavits are improper.

### III.

Plaintiffs also move to file a supplemental exhibit in support of their motion for class certification. The proposed exhibit is the affidavit of Richard Paletta, an attorney serving as plaintiffs' counsel in a similar case pending in the Circuit Court of Madison County, Illinois. Plaintiffs seek to introduce Paletta's affidavit to refute defendants' affidavits concerning defendants' methods of marketing Line–Backer. Paletta's affidavit states that he has obtained evidence concerning the marketing of Line–Backer in Michigan and contends that Michigan Bell sales representatives and service technicians have standardized sales pitches and scripts. Plaintiffs argue that the Court should admit Paletta's affidavit since defendants have effectively blocked plaintiffs' attempts to conduct discovery on this issue.

Defendants object to Paletta's affidavit on several grounds. First, defendants claim that Paletta has no personal knowledge and is not competent to testify about any matters contained in the affidavit. Second, defendants contend that the affidavit is hearsay. Finally, defendants argue that the information in the affidavit is based on documents obtained during merits discovery in the Illinois lawsuit and are irrelevant to class certification.

The Court finds that Paletta's affidavit is hearsay. Plaintiffs have failed to assert an exception which would allow the Court to admit Paletta's affidavit. Furthermore, the Court sanctioned defendants for submitting improper evidence by striking the affidavit of Ruth Curtis. Accordingly, plaintiffs will not be prejudiced by any of defendants' evidence. Plaintiffs' motion to file a supplemental exhibit is denied.

### IV.

Plaintiffs seek certification of two classes: 1) *residential customers,* which includes all persons residing in the State of Michigan who were charged or paid for Line–Backer for their residences from January 1, 1987, through the date of class certification; and 2) *simple business customers,* which includes all entities located in the State of Michigan who were charged or paid for Line–Backer for their small businesses from January 1, 1987, through the date of class certification. Plaintiff Robert Converse and Jeanne Phillips will represent the residential class. Plaintiff H.A. Welch on behalf of Borg Enterprises, Inc., d/b/a Capitol Fur Company, will represent the simple business class.

The Federal Rules of Civil Procedure mandate a two-part test for class certification. *Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). First, plaintiff must satisfy the four prerequisites set forth in Federal Rule of Civil Procedure 23(a) ("Rule 23(a)"). *Id.* If plaintiff satisfies the prerequisites, the Court must determine whether this action falls under one of the categories in Federal Rule of Civil Procedure 23(b) ("Rule 23(b)"). *Id.; Mayo v. Sears, Roebuck & Co.,* 148 F.R.D. 576, 579 (S.D.Ohio 1993).

District courts have broad discretion in deciding whether to certify a class. *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). The district courts must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class." *In re American,* 75 F.3d at 1079 (quoting *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Howev-

er, the court may not consider the merits of the action in determining whether to certify a class. *Mayo*, 148 F.R.D. at 579. It may be necessary for the court to look beyond the pleadings to determine if class certification is appropriate. *In re American*, 75 F.3d at 1079. " 'Therefore, the parties should be afforded the opportunity to present evidence on the maintainability of the class action.' " *Id.* (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir.1974)). "The party seeking the class certification bears the burden of proof." *Id.*

Federal Rule of Civil Procedure 23(a) provides:

> (a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In order to certify a class, the court must also find that the requirements of Rule 23(b)(1), (2), or (3) are satisfied. Plaintiffs argue that the requirements of Rule 23(b)(3) are satisfied. Rule 23(b) provides in pertinent part:

> (b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litiga-

tion of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Defendants do not dispute that plaintiffs have satisfied numerosity, Rule 23(a)(1), and adequacy of class counsel encompassed in Rule 23(a)(4). However, Rule 23(a)(2), (3) and (4), as it relates to the adequacy of the class, are in dispute. Under Rule 23(a)(3), plaintiffs must demonstrate that the claims or defenses of the representative parties are typical of the claims or defenses of the class. Similarly, to meet the requirements of Rule 23(a)(4), "[t]he representative must have common interests with unnamed members of the class." *In re American*, 75 F.3d at 1083 (citations omitted). "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.; see also Amchem*, —— U.S. at ——, 117 S.Ct. at 2251. Furthermore, Rule 23(a)(2) requires plaintiffs to demonstrate a common question of law or fact. Since " 'a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory,' " *In re American*, 75 F.3d 1069, 1082 (citations omitted), the prerequisites of commonality and typicality tend to merge. *Rodriguez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1016 (W.D.Mich.1987). Thus, the parties offer the same arguments in support and defense of a finding of commonality, typicality, and adequate representation.

Moreover, under Rule 23(b)(3), plaintiffs face the requirement that questions of law or fact must "predominate over any questions affecting only individuals." Since Rule 23(b)(3) is a more "stringent standard than that prescribed by Rule 23(a)(2), subdivision (a)(2) would be satisfied any time the court finds that the subdivision (b)(3) test is met." 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1763 (2d ed.1986); *see also Amchem*, —— U.S. at ——, 117 S.Ct. at 2250. Accordingly, the focus of the parties' arguments are on the require-

ments of Rule 23(b)(3). Therefore, the Court will primarily consider "whether [the] proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at ——, 117 S.Ct. at 2249.

The parties dispute whether defendants used negative option contracts to enroll customers in Line–Backer. The term "negative option contract" refers to the practice of enrolling customers in IWMS plans unless they affirmatively indicate that they do not wish to enroll in the plan. Plaintiffs contend that they have been unable to gain sufficient discovery on defendants' use of negative option contracts and that it is possible that they will learn that defendants engaged in negative option contracts to enroll customers in Line–Backer. Defendants claim that they never used a negative option contract scheme to enroll customers in Line–Backer.

Upon review of the evidence, the Court finds that defendants never used negative option contracts to enroll customers in Line–Backer. According to Shultz, whom plaintiffs deposed, customers were not enrolled in Line–Backer unless they affirmatively requested the service. Plaintiffs have not offered any evidence to the contrary. The Court's finding limits plaintiffs' arguments for class certification based on enrollment in Line–Backer to allegations that defendants failed to disclose the failure rate of inside wire and misrepresented the value of Line–Backer in written and oral communications with customers.

Defendants contend that plaintiffs' claims under the Sherman Act, 15 U.S.C. § 2, and the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.*, require proof of what information was disclosed to each putative class member in "hundreds of thousands of different communications" and proof of what information each plaintiff relied upon in deciding to enroll in Line–Backer. Accordingly, defendants assert that individual issues predominate over common issues under both Acts. Next, defendants claim that plaintiffs' state claim for money had and received requires proof of a predicate act of unjustness. Defendants further assert that the existence, source, and impact of the representations causing the alleged unjustness must be mea-

sured customer-by-customer, making a class action impossible. Finally, defendants argue that plaintiffs' state claim that the contracts for Line–Backer are void or voidable due to fraud requires the Court to sift through the particular circumstances of the contractual bargain of each putative class member. Defendants assert that the alleged oral and written representations were made to the putative class in a variety of ways and from a variety of sources and that each plaintiff's claim necessarily requires an individual analysis of his or her contacts with defendants. Therefore, defendants assert that individual not common issues predominate in this case.

Plaintiffs argue that even if the Court focuses solely on written and oral communications, their claims against defendants arise out of the same course of conduct by defendants. Thus, plaintiffs' claim that although communications to the putative class may not have been identical, they were substantially similar and were part of a common scheme to mislead consumers. Plaintiffs explain that every communication made by defendants concerning Line–Backer contained the same deceptive feature—the suggestion that the true value received would be equal to the price paid for the service and omissions regarding the actual failure rate of inside wire. Therefore, plaintiffs assert that common issues regarding defendants' liability predominate.

Plaintiffs contend that this case is identical to *Sollenbarger v. Mountain States Telephone and Telegraph Co.*, 121 F.R.D. 417 (D.N.M.1988), where the court certified an IWMS class action. In *Sollenbarger*, the plaintiffs alleged a violation of the Sherman Act, 15 U.S.C. § 2, and claimed that the IWMS contracts are void or voidable under state law. *Id.* at 417. The court certified the class despite the fact that some class members were solicited through a negative option scheme and others were solicited through oral communications with service representatives.

This Court finds, however, that *Sollenbarger* is factually distinguishable from the facts of this case. First, the *Sollenbarger* court found that the defendant used negative option contracts to enroll customers in IWMS.

*Id.* at 421. Customers were sent a notice which stated that "you will continue to have an IWMS contract unless you notify us that you do not want an IWMS contract." *Id.* Moreover, even though the plaintiffs' complaint included an allegation of misrepresentation and omissions during oral communications, the Court only addressed defendants' use of negative option contracts when discussing predominance under Rule 23(b)(3). Since this case does not involve the use of negative option contracts to enroll customers in an IWMS plan, the Court does not find the *Sollenbarger* opinion instructive.

Although this Court is not bound by any of the case law presented by the parties, the Court finds persuasive several courts' analyses on class certification. In *Strong v. Bellsouth Telecommunications Inc., d/b/a South Central Bell,* No. 93–0999, slip op. at 5 (W.D.La. Jan. 24, 1994), the Court found:

> The absence of a negative option plan supports the conclusion that defendant's deceptive and misleading marketing techniques, if true, impacted differently on individual class members. This, in turn, gives rise to the potentiality of a multitude of individual questions that cannot be resolved on a class-wide basis.

The court further explained that "the plaintiffs' claims were too disparate" because "... the plaintiffs vary greatly in the ways by which they became IWMS customers." *Id.* at 6. In *Strong,* one plaintiff consented to IWMS, another consented but thinks his secretary signed the consent form, two others do not recall consenting, and the fifth plaintiff verbally consented.

Similarly, defendants in this case did not enroll customers through negative option contracts. Therefore, individual issues such as what each plaintiff read or heard and what each plaintiff relied upon in deciding to enroll in Line–Backer exist. Furthermore, like the plaintiffs in *Strong,* the plaintiffs in this case enrolled in Line–Backer under varied circumstances and based on allegedly different oral representations.

▮ Plaintiff Jeanne Phillips enrolled in Line–Backer when she called Michigan Bell to arrange for the repair of her telephone, which "went dead." Phillips claims that the service representative led her to believe that if she had Line–Backer she would not have to pay $50 or $60 in the future to repair problems with her telephone. Plaintiff Robert Converse does not remember ordering Line–Backer and cannot recall what he was told or read to induce him to order the service. Plaintiff H.A. Welch first learned of Line–Backer from a repair technician on a service call to examine a switching box problem. The service technician told Welch that Line–Backer might prevent him from paying for such calls in the future and to call a service representative to inquire. Welch called a service representative and claims that he was led to believe that Line–Backer covered repair of equipment. Welch enrolled in Line–Backer during his conversation with the service representative. This Court agrees with the *Strong* court that "the class representatives remain too diverse to adequately protect the interests of absent class members." *Id.*

The Court also finds persuasive the recent opinion in *Meyers v. Southwestern Bell Telephone. Co.,* No. CIV–95–827–C, 1997 WL 912184, —— F.R.D. —— (W.D.Okla. Jan. 9, 1997). In *Meyers,* plaintiff claimed that defendant "engaged in deceptive and misleading techniques to induce customers into purchasing IWMS and has repeatedly raised the price for IWMS." *Id.* at 2. In analyzing plaintiff's state claims of fraudulent misrepresentation and/or omission, negligent misrepresentation and/or omission, breach of contract and breach of implied covenant of good faith and fair dealing, the court stated that "the central issue in all of plaintiff's legal theories is the nature of defendant's communication with its customers regarding IWMS." *Id.* at 5. The court explained that the majority of customers enrolled in the IWMS through oral contacts with service representatives. *Id.* at 13. The court concluded that the "numerous avenues for these contacts supports the conclusion that individual issues of reliance and exactly what representations were made predominate over common issues." *Id.*

In this case, plaintiffs claim under state law that the contracts for Line–Backer are void or voidable and they claim money had

and received. In making such claims, plaintiffs are asserting that the contracts for Line–Backer are void or voidable because plaintiffs were deceived into believing Line–Backer was a valuable service and that they did not receive what they paid for because they paid for a service which has no value. The Court finds that both of these claims necessarily involve misrepresentation and fraud. Accordingly, the Court would have to determine whether the oral statements or written material, which induced each plaintiff to enroll in Line–Backer, is fraudulent. Plaintiffs Phillips and Welch testified that they signed up for Line–Backer during a conversation with a service representative. However, they claim that different misrepresentations caused them to enroll in Line–Backer. Plaintiff Converse cannot remember how he signed up and cannot remember what he may have read or may have been told which induced him to purchase Line–Backer. It is clear to the Court that common issues do not predominate over individual issues for the representative class, let alone the entire proposed class. Defendants used a variety of methods to inform customers about Line–Backer. Plaintiffs have failed to prove that the oral representations and written materials were substantially similar and were part of a common scheme to mislead consumers. Without such proof, "individual issues of reliance and exactly what representations were made predominate over common issues." *Id.*

Turning to plaintiff's antitrust claims, the *Meyers* court stated that plaintiff must prove that defendant's conduct was an " 'abnormal response to market opportunities.' " *Id.* at 15.

> In other words, issues of fraud and misrepresentation will continue to be central in the antitrust claims as well. This Court might be willing to indulge plaintiff's motion for class certification if he had shown that SWBT's actions over the ten to fourteen year period were so interrelated or similar as to constitute a common course of conduct. However, as identified above, in order to identify the lawfulness of plaintiff's misrepresentation claims the Court would have to probe a preponderance of individual issues regarding individual

plaintiffs or, at least, numerous discrete subclasses. Thus, plaintiff's antitrust violations fall victim to the same deficiencies as his state common law claims.

*Id.*

Like the antitrust claim in *Meyers,* plaintiffs' federal antitrust claim and their claim under the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.,* raise issues which are too diverse to warrant class certification. As explained above, plaintiffs have failed to introduce any evidence suggesting that defendants' oral communications with customers contained similar misrepresentations and omissions. The evidence before the Court suggests the opposite. Evidence submitted by defendants state that oral communications occurred in a variety of circumstances and were not scripted, but varied from representative to representative and customer to customer. In regard to written material, plaintiffs have failed to show that any written material caused any of the representatives to contract for Line–Backer. Even if a representative plaintiff relied on written material, the Court finds that the evidence does not establish that the written material is so similar as to represent a common course of action. Therefore, questions concerning what statements or material other members of the representative class relied upon in deciding to purchase Line–Backer would exist. Accordingly, individual questions predominate over common questions.

Plaintiffs suggest that even if the Court does not certify a class on the initial enrollment in Line–Backer, defendants' negative option price increases warrant class certification of every person or entity subjected to a negative option price increase from 1987 to the present. Defendants unilaterally raised the price of Line–Backer periodically since 1987. Harvey testified that customers are notified of rate changes for Line–Backer thirty days before the date the change becomes effective through a written notification included with the customers' monthly bills. The Court has reviewed such rate increase notices. The notices explain that Line–Backer is a service which provides "diagnostic service and repair with no charge for service

visits." The notices further state that "due to the increased costs of providing this service, the price for Line–Backer ... will increase." Plaintiffs assert that virtually identical notices which fail to disclose material facts about Line–Backer were received by everyone in the proposed class. Plaintiffs, therefore, contend that common issues predominate.

The Court finds however that it is impossible to divorce any misrepresentations or omissions contained in the notices from the information originally disclosed to each individual when he or she enrolled in Line–Backer. Whether the information contained in the notice was adequate or was a misrepresentation depends upon the information the company originally provided to each customer. In other words, if a customer received complete information, the brief explanation of the service provided in the increase notices may be adequate. On the other hand, if the company originally provided inadequate information or misrepresented the value of Line–Backer, the notification may be inadequate. Therefore, a case involving a class of people subjected to unilateral price increases would again involve questions of what each plaintiff read or was told which induced him or her to enroll in Line–Backer. For the reasons explained above, individual issues predominate, preventing this Court from certifying plaintiffs' proposed classes.

## V.

For the reasons stated above, the affidavit of Ruth Curtis will be stricken from the record, the Court will not admit the affidavit of Richard Paletta, and the Court will deny plaintiffs' motion for class certification. An appropriate order will be entered.